# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

DANIEL E. THOMAS,                    :

      Plaintiff,                    :

          Case No. 3:08cv00130

  vs.                                   :

          District Judge Thomas M. Rose

MICHAEL J. ASTRUE,                    :   Magistrate Judge Sharon L. Ovington
Commissioner of the Social
Security Administration,              :

      Defendant.                    :

## REPORT AND RECOMMENDATIONS[1]

## I.     INTRODUCTION

      Plaintiff Daniel E. Thomas suffers from various health problems including low
back pain, leg pain, swelling in his feet, obesity, diabetes, and depression.  (Tr. 52, 65,
364).  He began suffering back pain in the late 1980s but continued to work until
September 6, 2002.  (Tr. 52, 59).  Approximately sixteen months later he sought financial
assistance from the Social Security Administration by applying for Supplemental Security
Income (SSI) and Disability Insurance Benefits (DIB).  Plaintiff asserted in his
applications that beginning on September 6, 2002 he could no longer work because he
was under a "disability" within the meaning of the Social Security Act.

      After various administrative proceedings, Administrative Law Judge (ALJ)
Thaddeus J. Armstead, Sr. denied Plaintiff's DIB and SSI applications.  ALJ Armstead
concluded mainly that Plaintiff's impairments did not constitute a "disability" within the

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

meaning of the Social Security Act. (Tr. 22). The ALJ's nondisability determination and the resulting denial of benefits later became the final decision of the Social Security Administration. Such final decisions are subject to judicial review, *see* 42 U.S.C. §405(g), which Plaintiff is now due.

This case is before the Court upon Plaintiff's Statement of Specific Errors (Doc. #12), the Commissioner's Memorandum in Opposition (Doc. #13), Plaintiff's Reply to Defendant's Memorandum in Opposition (Doc #15), the administrative record, and the record as a whole. Plaintiff seeks an Order reversing the ALJ's decision. The Commissioner seeks an Order affirming the ALJ's decision.

## II.    BACKGROUND

### A.    <u>Plaintiff and his Testimony</u>

At the time of the ALJ's decision, Plaintiff's age (fifty years old) placed him in the category of a "person closely approaching advanced age" for purposes of resolving his DIB and SSI applications. *See* 20 C.F.R. §§404.1563(d), 416.963(d). (Tr. 61). He completed high school and attended college for two years, obtaining an "Associate's Degree of Applied Science as a network engineer." (Tr. 58).

Plaintiff testified during the ALJ's hearing that he is divorced and lives with his parents, sister, and two nieces. (Tr. 356-57). He worked as a systems configuration engineer from 2001 to September 6, 2002 when he was involved in a motorcycle accident. (Tr. 359). He took time off work due to the accident, and when he came back to work, he was downsized. *Id.* From July 2005 to November 2005, Plaintiff testified that he completed a contract job with Diebold Election Systems. (Tr. 360-62).

Plaintiff testified that the root of his medical problems that prevent him from working is the "combination of everything." (Tr. 364). He testified:

> I believe that the back is the root of a lot of the things that are going
> on with me, along with my diabetes with, that helps with your depression,
> but I believe there are some nerves in my back that are honestly giving me
> the problems with my knee and shoulder. The hematoma causes great, I'm

not going to say discomfort, but I'm aware of it and it does cause some grief while I'm sleeping.

(Tr. 364).

As to his back problems, Plaintiff testified he started receiving treatment in the early 1990's, which included physical therapy clinics, a chiropractor, and several medical doctors. (Tr. 364-65). He further testified that he used a cane since 1998 on a daily basis. (Tr. 370). By 2002 he had received treatment for obesity, thyroid problems, hypertension, and diabetes. (Tr. 366-67).

Plaintiff further testified:

The pain associated with my back is a constant pain. If I were to rate it on a scale of zero to ten, ten being the most extreme pain, it's a constant pain of about a five or a six, at times flaring to greater numbers than that, quite possibly an eight or a nine.

(Tr. 369). At the time of the ALJ's hearing, Plaintiff took Naprosyn to treat his back pain. (Tr. 367, 369). Naprosyn, however, does not help alleviate his back pain but it does help "with shorter pain and pain in [his] right knee." (Tr. 369). Plaintiff also received physical therapy in a pool, which was not helping. *Id.* The most comfortable position for Plaintiff is lying in a fetal position on his right side. (Tr. 370).

Plaintiff considers his right knee as his next biggest impairment. (Tr. 370). He does not wear a knee brace, and his knee has given out on him several times. He uses a cane on a daily basis. *Id.* He has been prescribed an electric chair and was in the process of procuring one through Medicaid. *Id.* The physical therapy he was receiving for his back was also supposed to help with his right knee. *Id.*

Plaintiff testified that he had been in and out of the hospital to treat a hematoma on the inside of his left thigh. (Tr. 372). According to Plaintiff, the left-leg hematoma cause the following limitations:

At times I have to straighten this leg out because it swells up ... behind my knee and it causes me discomfort there where the skin comes together. I have to keep my leg elevated in the evenings to allow this to

drain. In the mornings when I get up, it is more normal of appearance and by the end of the day it's pretty swollen up.

(Tr. 373). By "pretty swollen," Plaintiff meant that his left thigh is about five inches larger than his right thigh. *Id*.

Plaintiff also has left shoulder pain, stating that it feels like it is out of joint. *Id*. He acknowledges, however, that x-rays indicate "it's more of an arthritis type thing...," probably associated with his back. *Id*. He can raise his arms to shoulder level and has difficulty putting on clothing. (Tr. 374). He testified that the pain from his shoulder extends down through his arm. (Tr. 374-75).

Plaintiff takes prescription medication to treat the diabetes. He described the symptoms he feels from diabetes as follows:

> [A]t times during the day I get extremely tired and my blood sugar sometimes goes up. It was just recently that I started, I have been able to start having a more correct diet. That does seem to have subsided. I have problems with my feet and that's about it.

(Tr. 375).

Plaintiff testified he was originally treated for depression in 1996. (Tr. 376). The depression was associated with a substance abuse problem and was abusing pain medication and muscle relaxers. *Id*. He has been sober since 1996. *Id*. He more recently began treatment with South Community because the "depression started flaring back up due to the fact that I just feel like a useless human being. I'm not compatible with society. I'm not able to support myself and I just felt as though I had no reason to go on." *Id*. He was also treating the depression with a prescription medication (the generic version of Celexa). The medication seems to help but he still gets depressed and still attended counseling every other week. (Tr. 377). Plaintiff has also struggled with anxiety and self-destructive fantasies. Yet he had not had these problems since taking mediation. (Tr. 377).

Plaintiff testified he can only sit for 30 minutes at a time, stand for 5 minutes, and walk 30 yards at a time. He can lift up to 10 pounds with left hand and 15-25 pounds with right hand. (Tr. 379-80, 384).

Plaintiff rides his motorcycle a couple of times a month and writes poetry. (Tr. 381). He goes to church once a week. (Tr. 380). And once or twice a week he visits a friend who owns an automotive shop. (Tr. 382-83).

### B.     Other Evidence

Plaintiff relies on the opinions of Dr. Fenberg, his treating physician from 1994 through 2005. (Tr. 248-67). In February 2004 Dr. Fenberg reported Plaintiff's diagnosis as lumbosacral disc disease with radiculopathy to the left leg. He explained that its onset was in 1987 after a trauma where Plaintiff was beaten by a group of men. Plaintiff has had lower back pain since then that increased with walking. Plaintiff also experienced numbness in his left leg with walking. Dr. Fenberg indicated his pertinent findings on examination were tenderness to palpation of the lumbosacral areas and paraspinal muscles with localization to L4-5 vertebral regions. Dr. Fenberg concluded that Plaintiff was limited to driving up to two hours at a time, lifting less than forty pounds, sitting in a chair less than two hours at a time, standing no more than one-half hour, and had increased back pain if he walked more than two blocks. (Tr. 248-50).

In November 2004 Dr. Fenberg reported Plaintiff's diagnoses as diabetes, hypertension, morbid obesity, lumbar spine disc herniation, chronic lumbar spine strain and hypothyroidism. He noted that Plaintiff had experienced back pain and other medical problems for several years. Dr. Fenberg opined that Plaintiff could stand/walk for less than one hour in an eight-hour workday and sit for one to two hours without interruption for four to six hours in an eight-hour workday. Dr. Fenberg also believed that Plaintiff could lift eleven to twenty pounds occasionally and six to ten pounds frequently. He further opined that Plaintiff was moderately limited in his ability to push/pull and reach, markedly limited in his ability to perform repetitive foot movements, and extremely

limited in his ability to bend.  According to Dr. Fenberg, Plaintiff had limited range of motion of his lumbar spine and hips as well as morbid obesity; he needs a cane to walk; and he has degenerative arthritic changes in his knees.  Dr. Fenberg concluded that Plaintiff was unemployable for twelve months or more.  (Tr. 259-61).

In early 2003 Dr. Flexman examined and tested Plaintiff upon referral from a physician for evaluation of constant headaches and additional problems including, for example, his feeling of being overwhelmed by sounds and noises in his environment, and his difficultly maintaining concentration.  (Tr. 115).  Dr. Flexman reported that Plaintiff had some mild variability in his nonverbal processing of information and a mild cognitive impairment and a high likelihood of learning difficulties. (Tr. 117).  Dr. Flexman recommended "some type of therapeutic intervention..." and medication (Lexapro).  *Id.*

Dr. Vitols evaluated Plaintiff in March 25, 2004 for the Ohio Bureau of Disability Determinations.  (Tr. 118-127).  Plaintiff presented with a waddle type gait, that was slow and non-antalgic.  He did not use any assistive devices for ambulation.  Dr. Vitols could not attest to the degree, if any, of myospasm in the low back due to exogenous obesity.  (Tr. 121).  Dr. Vitols noted that Plaintiff had some relative weakness and restricted motion of the right shoulder, but no motor or sensory deficits were identified in all four extremities.  *Id.*  There was restricted spinal motion associated with pain in the low back.  *Id.*

Dr. Vitols reported that X-rays of the lumbar spine revealed five lumbar vertebrae with disc spaces maintained at all levels and without destructive bony lesions.  (Tr. 122).  He diagnosed Plaintiff with exogenous obesity, diabetes, depression, past history of alcoholism, and controlled hypothyroidism.  (Tr. 122).  Dr. Vitols concluded that based on the clinical objective findings of the examination, Plaintiff's work capabilities and tasks of daily living were affected accordingly.  (Tr. 123).

In August 2004 Plaintiff was involved in a motorcycle accident. (Tr. 158, 166, 206-10). He had rib pain and left knee pain with swelling; his gait was antalgic but he was able to bear weight. (Tr. 166).

In September 2004 Plaintiff was treated by an orthopedic specialist, Dr. Powell, who found that Plaintiff had some attenuation of his medial collateral ligament and a massive, basketball-sized hematoma along the medial aspect of his left thigh extending posteriorly to the popliteal region. Dr. Powell recommended continuing his medication and stated that Plaintiff would not be able to work at that point or do any significant lifting and squatting. (Tr. 158-59). In October 2004 Dr. Powell continued Plaintiff's restrictions of no significant lifting and squatting, and no furniture moving for thirty days. (Tr. 157).

An MRI taken of Plaintiff's lumbar spine on May 9, 2006, revealed multilevel degenerative disc disease at L2-3, L3-4, L4-5 with disc bulges and central and bilateral foraminal stenosis which generally appeared more pronounced on the right and L5-S1 mild central disc bulge. (Tr. 337-38).

The Commissioner relies on Dr. Perencevich, a state agency reviewing physician, who concluded in April 2004 that Plaintiff could perform light exertional work[2] with only occasionally climbing of ladders, ropes, and scaffolds, and frequent climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling. (Tr. 129-34).

The Commissioner also relies on Dr. Gahman, a state agency reviewing physician, who affirmed Dr. Perencevich's assessment after reviewing the record evidence in December 2004, which included the evidence of Plaintiff's hematoma. (Tr. 134, 176).

---

[2]  The Regulations define light work as involving the ability to lift "no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds...." 20 C.F.R. §404.1567(b).

## C.  <u>Vocational Expert</u>

A vocational expert (VE) testified at the administrative hearing that Plaintiff's past work as a machine set-up operator was skilled and required a medium level of exertion. His work as a software engineer was also skilled and required a sedentary level of exertion.  (Tr. 386).

The ALJ posed a hypothetical question to the VE describing someone of Plaintiff's age, education, past work experience, who required the opportunity to sit or stand ten to fifteen minutes per hour at his convenience but need not be consecutively; adjust the seating position by shifting or moving in place; no climbing of ladders, ropes, or scaffolds; only occasional stooping; no use of foot pedals, leg controls, or similar controls involving the lower extremities; no overhead reaching; only occasional strenuous grasping with the right upper extremity, such as holding and turning a wrench or a screwdriver forcibly; and only occasional work setting and work routine changes.  (Tr. 387).  The VE opined that such an individual could perform approximately 11,000 light exertional jobs in the region, such as microfilm processor, labeler, and small products assembler II and at the sedentary level, the individual could work as an addresser, surveillance systems monitor, or toy stuffer.  (Tr. 388).

The ALJ then inquired about the effect on the number of jobs if the individual needed to use a cane.  *Id.*  The VE testified that there would be no effect on the jobs identified since they were stationary jobs.  *Id.*  The VE continued that these jobs allowed an individual to sit and stand at will.  (Tr. 389).

## III.    **"DISABILITY" REQUIREMENT AND ADMINISTRATIVE REVIEW**

The definition of the term "disability" is essentially the same for both DIB and SSI.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant (1) from performing his or her past job, and (2) from engaging in "substantial gainful activity" that

is available in the regional or national economies.  *See Bowen*, 476 U.S. at 469-70 (1986).

A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a

disability.  *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary*

*of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v.*

*Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

Social Security Regulations require ALJs to resolve a disability claim through a

five-Step sequential evaluation of the evidence.  *See* Tr. 12-22; *see also* 20 C.F.R.

§§404.1520(a)(4), 416.920(a)(4).[3] Although a dispositive finding at any Step terminates

the ALJ's review, *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully

considered, the evaluation answers five questions:

1. Has the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Colvin*, 475 F.3d at 73; *Foster v. Halter*, 279

F.3d 348, 354 (6th Cir. 2001).  If the ALJ makes "a dispositive finding at any point in the

five-step process, the review terminates."  *Colvin*, 475 F.3d at 730 (citations omitted).

---

[3]  The remaining citations will identify the pertinent DIB Regulations with full knowledge of the corresponding SSI Regulations.  *See also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007)

In the present case the ALJ made a Step 1 finding that Plaintiff engaged in substantial gainful activity from July 2005 through November 2005. However, he did not engage in substantial gainful activity at any other relevant time period since September 6, 2002. (Tr. 14).

The ALJ found at Step 2 that Plaintiff had the following severe combination of impairments: "exogenous obesity; diabetes, hypothyroidism, and high blood pressure..., all controlled; vertebrogenic disorder, mild; history of hematoma, left media thigh with associated treatment." *Id.*

The ALJ determined at Step 3 that Plaintiff does not have an impairment or a combination of impairments that meet or equal one in the Listings. (Tr. 15).

At Step 4 the ALJ found that Plaintiff had the Residual Functional Capacity to perform a limited range of light work. The ALJ described his specific findings as follows:

> [Plaintiff] must be provided the opportunity to sit or stand an added 10 minutes per hour at his convenience, and need not be consecutively, and adjust the seated position by shifting or moving in place; should not climb ladders, ropes, or scaffolds; should not perform overhead reaching; should not use foot pedals, leg controls, or similar controls involving the lower extremities; and should not perform more than occasional strenuous grasping or gripping with the right upper extremity, an example of which, but not exclusively, would be the strength needed to turn a wrench or a screwdriver forcefully.

(Tr. 17). With this assessment in mind, the ALJ further determined at Step 4 that Plaintiff retained the ability to perform his past relevant work as a software engineer. (Tr. 21). Although this Step-4 determination triggered the finding that Plaintiff was not under a disability, the ALJ "parenthetically" noted that "a finding of nondisability could also be reached at step 5 of the sequential evaluation process." (Tr. 21). The ALJ explained that Plaintiff retained the ability to perform a significant number of jobs, which, based on the VE's testimony, exist in a significant number in the regional and national economies. (Tr. 21-22).

The ALJ's findings thus led him to conclude that Plaintiff had not been under a disability from his claimed disability onset date of September 6, 2002 to the date of the ALJ's decision.  (Tr. 12-22).

## IV.  JUDICIAL REVIEW

Judicial review of an ALJ's decision focuses in part on whether substantial evidence in the administrative record supports the ALJ's factual findings.  *Bowen v. Comm'r. of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).  "Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Bowen*, 478 F3d at 746 (citing in part *Richardson v. Perales*, 402 U.S. 389, 401 (1977)).  It consists of "more than a scintilla of evidence but less than a preponderance."  *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  Judicial review for substantial evidence is deferential not *de novo*.  *See Cruse v. Commissioner of Social Sec*. 502 F.3d 532, 540 (6th Cir. 2007); *see also Cutlip v. Secretary of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).  The Court's agreement or disagreement with the ALJ's findings plays no role in the substantial evidence review, and no significance attaches to contrary evidence in the record – if other substantial evidence supports the ALJ's findings.  *Rogers*, 486 F.3d at 241; *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).

Reviewing for substantial supporting evidence is not the stopping point of judicial analysis.  Courts also examine the administrative decision to determine whether the ALJ applied the correct legal criteria.  *See Bowen*, 478 F.3d at 746.  If the ALJ did not, the decision may not be upheld even when substantial evidence supports the ALJ's findings.  *See id.*  For example, a decision will not be upheld where the ALJ failed to apply the standards mandated by the Social Security Regulations and where that failure prejudices a claimant on the merits or deprives the claimant of a substantial right.  *See Bowen*, 478 F.3d at 746 (and cases cited therein).  Through *Bowen* and other recent Sixth Circuit cases, an ALJ's failure to apply the correct legal criteria – at least when evaluating

11

medical source opinions – mandates further judicial review for harmless error. *Bass II v. McMahon*, 499 F.3d 506, 512 (6th Cir. 2007); *see Bowen*, 478 F.3d at 747-49; *see also Wilson*, 378 F.3d at 547-49 (offering examples of possible *de minimis* errors). Consequently, if the ALJ erred by not applying the correct legal criteria but the error was harmless, the decision should be affirmed. *See Bass II*, 499 F.3d at 512 (and cases cited therein).

## V.   DISCUSSION

### A.   Plaintiff's First Contentions

Plaintiff contends that the ALJ erred by failing to follow the Commissioner's own rules and by failing to consider the entire record when evaluating the opinions of his treating physician Dr. Fenberg.

### 1.

The treating physician rule, when applicable, requires ALJs to place controlling weight on a treating physician's opinion rather than favoring the opinion of a nonexamining medical advisor, or an examining physician who saw a claimant only once, or a medical advisor who testified before the ALJ. *Wilson v. Comm'r. of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004); *see Lashley v. Secretary of Health and Human Services,* 708 F.2d 1048, 1054 (6th Cir. 1983); *see also* 20 C.F.R. §404.1527(d)(2), (e), (f). A treating physician's opinion is given controlling weight only if it is both well supported by medically acceptable data and if it is not inconsistent with other substantial evidence of record. *Wilson*, 378 F.3d at 544; *see Walters v. Commissioner of Social Security*, 127 F.3d 525, 530 (6th Cir. 1997); *see also* 20 C.F.R. §404.1527(d)(2).

If a treating physician's opinion is not given controlling weight, then it must be weighed against other medical source opinions under a number of factors set forth in the Commissioner's Regulations – "namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship,

supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source – in determining what weight to give the opinion." *Wilson*, 378 F.3d at 544 (citing 20 C.F.R. §416.927(d)(2)).

In general, more weight is given to the opinions of examining medical sources than is given to the opinions of non-examining medical sources. *See* 20 C.F.R. §416.927(d)(1). However, the opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight. This occurs because the Commissioner views nonexamining sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p. Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization. *See* 20 C.F.R. §416.972(d), (f).

**2.**

The ALJ's decision in the present case did not separately describe the legal criteria applicable to weighing the opinions of treating physicians or other medical sources. Instead, the ALJ merely stated that he "considered the opinion evidence in accordance with the requirements of 20 C.F.R. §404.1527, 416.927 and Soc. Sec. Rulings 96-2p, 96-5p, 96-6p, and 06-3p." (Tr. 17). Without a separate description of the legal criteria actually applied by the ALJ – as he did, for example, when considering Plaintiff's credibility, *see* Tr. 17-18 – the ALJ's decision must be scrutinized to determine whether he "applied the correct legal criteria" when weighing the medical source opinions. *Bowen*, 478 F.3d at 745-46. Doing so, however, reveals that the ALJ did weigh the opinions of Dr. Fenberg and the other medical sources under the correct legal standards and that substantial evidence supports the ALJ's evaluation of those opinions as well as his assessment of Plaintiff's Residual Functional Capacity.

Dr. Fenberg provided two separate opinions regarding Plaintiff's functional abilities. On an unspecified date, Dr. Fenberg opined that Plaintiff was limited to driving up to two hours at a time, lifting less than forty pounds, sitting in a chair less than two hours at a time, standing no more than one-half hour, and had increased back pain if he walked more than two blocks. (Tr. 250). In November 2004 Dr. Fenberg completed a "Basic Medical" form, opining that Plaintiff could stand/walk for less than one hour in an eight-hour workday and sit for one to two hours without interruption for four to six hours total in an eight-hour workday. (Tr. 259). According to Dr. Fenberg, Plaintiff could lift eleven to twenty pounds occasionally and six to ten pounds frequently. (Tr. 259). He indicated that Plaintiff was moderately limited in his ability to push/pull and reach; markedly limited in his ability to perform repetitive foot movements, and extremely limited in his ability to bend. (Tr. 259).

As the ALJ acknowledged, a limitation to a range of light work is essentially consistent with Dr. Fenberg's opinions. (Tr. 19). Dr. Fenberg's November 2004 lifting restriction was within the limits of light work and his undated lifting limitation even exceeds the range of light work. Dr. Fenberg's limitation to driving and sitting no more than two hours at a time (Tr. 250) and sitting for a total of four to six hours in an eight-hour workday (Tr. 259) was accommodated by the ALJ's provision that Plaintiff should be allowed the opportunity to sit or stand an added ten minutes per hour at his convenience. Plaintiff's marked limitation in his ability to perform repetitive foot movements (Tr. 259) was accommodated by the ALJ's provision that Plaintiff should not use foot pedals, leg controls, or similar controls involving the lower extremities (Tr. 17, 19), and the moderate limitation in his ability to push/pull and reach (Tr. 259) was accommodated by the ALJ's decision to restrict Plaintiff to no overhead reaching and only occasional strenuous grasping or gripping with the right upper extremity (Tr. 17, 19).

The ALJ appropriately recognized that the only functional limitations he would not adopt were Dr. Fenberg's opinion that Plaintiff could stand/walk for less than one hour in

an eight-hour workday (Tr. 259); he could stand for no more than one-half hour and had increased back pain if he walked more than two blocks (Tr. 250); and he was markedly limited in his ability to bend (Tr. 19-20, 259). Yet, contrary to Plaintiff's contentions, the ALJ discussed Dr. Fenberg's opinion that Plaintiff could stand and walk less than one hour and that he was extremely limited in his ability to bend and stoop and reasonably concluded that it was not entitled to great weight because it was not supported by objective medical findings, as permitted by the Regulations. *See* Tr. 17, 20); *see also* 20 C.F.R. §§404.1527(d)(2), 416.927(d)(2); Social Security Ruling (SSR) 96-2p. In addition, when asked for physical findings in the November 2004 form, Dr. Fenberg only indicated that Plaintiff had limited range of motion of his lumbar spine, hips, and knees, as well as morbid obesity, plus limiting factor of arthritic changes. (Tr. 261). When asked for observations and/or medical evidence that led to his conclusions regarding Plaintiff's physical limitations and also for examples of the specific physical limitations, Dr. Fenberg again only noted flexibility of the spine and legs, morbid obesity, need of a cane to walk, and degenerative arthritic changes noted in knees. (Tr. 259). On the undated form, when asked to describe all pertinent findings on examination, Dr. Fenberg noted only tenderness to palpation of the lumbosacral areas and paraspinal muscles with localization fo L4-5 vertebral regions. (Tr. 249). Dr. Fenberg did not provide any explanation, on either assessment form, how these relatively minimal findings resulted in the inability to stand or walk for more than an hour, or the inability to bend or stoop. In light of these shortcomings, substantial evidence supported the ALJ's rejection of Dr. Fenberg's opinions about Plaintiff's functional abilities, because the record supports that Dr. Fenberg did not support his opinions with proportionate objective findings. *See* 20 C.F.R. §405.1527(d); *see also Smith v. Commissioner of Soc. Sec.*, 482 F.3d 873, 876-77 (6th Cir. 2007)(finding no error in the ALJ's rejection of two treating physicians' opinions).

Contrary to Plaintiff's claim, the ALJ did not fail to consider the entire record or fail to acknowledge Dr. Fenberg's repeated conclusions throughout the record that supported his assessments or conclusions about employability. Plaintiff's brief does not point to any of this purported supporting evidence and only provides citation to the completed assessments themselves. (Doc. #12 at 19-20). More importantly, Dr. Fenberg's own contemporaneous treatment notes failed to support his opinion. For example, in September 2002, the month Plaintiff's claimed his disability began, Dr. Fenberg's notes seem to focus on Plaintiff's diabetes and cholesterol control. (Tr. 263). It further appears that Dr. Fenberg prescribed a medication (Viagra) not related to pain control. (Tr. 263).

In February 2004 Dr. Fenberg noted that Plaintiff had an upper respiratory infection (URI) and sinus problem. (Tr. 263). In July 2004, Dr. Fenberg apparently wrote "see exam for disability" (Tr. 262), but this exam does not seem to appear in the records he submitted. In August 2004, Dr. Fenberg again completed paperwork and performed a brief examination. (Tr. 262). In November 2004, Dr. Fenberg completed paperwork – presumably the November 2004 assessment – yet his notes reflect that Plaintiff had not taken any medication for three months. (Tr. 262). Dr. Fenberg again performed a very brief examination, diagnosed chronic back pain with radiculopathy, and refilled Plaintiff's medications. (Tr. 262).

Subsequent treatment notes concern Plaintiff's left leg hematoma and drainage (Tr. 253-58), a condition that completely resolved by April 2005, according to Dr. Termuhlen. (Tr. 244). In light these specifics, Dr. Fenberg's contemporaneous progress notes failed to support his opinion that Plaintiff could stand and walk for less than one hour and was markedly limited in his ability to bend and stoop.

Next, the ALJ did not err by declining to place controlling weight, or even significant weight, on Dr. Fenberg's opinions because those opinions were inconsistent with other substantial record evidence, including the assessments of the consultative and

state agency reviewing physicians, Drs. Vitols, Perencevich, and Gahman. 20 C.F.R. §§ 404.1527(d)(2), (4), 416.927(d)(2), (4); Soc. Sec. Ruling 96-2p. In March 2004 Dr. Vitols performed a consultative evaluation and noted that Plaintiff had some relative weakness and restricted motion of the right shoulder, but he further stated, "no motor or sensory deficits are identified in all four extremities." (Tr. 122). There was restricted spinal motion associated with pain in the low back. (Tr. 122). Dr. Vitols indicated that there was no history of intermittent claudication, no evidence of peripheral vascular disease or evidence of capsular thickening, no rheumatoid nodules were identified (Tr. 122). Plaintiff presented with a waddle-type gait, that was slow and non-antalgic, but Dr. Vitols expressly noted that Plaintiff did not use any assistive devices for ambulation (Tr. 121). Dr. Vitols reported that, based on the clinical objective findings of the examination, Plaintiff's work capabilities and tasks of daily living were affected accordingly. (Tr. 123). Dr. Perencevich, reviewed the record evidence and concluded Plaintiff could perform light exertional work with only occasionally climbing of ladders, ropes, and scaffolds, and frequent climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling (Tr. 129-34). Similarly, Dr. Gahman reviewed the record evidence, including the evidence of Plaintiff's hematoma, and affirmed Dr. Perencevich's assessment. (Tr. 134, 176). Dr. Gahman specifically indicated that the restrictions on lifting, squatting, and standing more than ten minutes reported by Dr. Powell were not expected to last. (Tr. 176). These opinions that Plaintiff could perform light exertional work contradict Dr. Fenberg's conclusory opinion that Plaintiff was unemployable or could not walk and stand even one hour in an eight-hour day.

Plaintiff contends that the following opinions or records of other medical sources doctors corroborate Dr. Fenberg's opinions:

- Dr. Jump, who noted in November 1994 that Plaintiff was tender to palpitation over the lumbosacral paraspinal musculature with some increased localization to the L4-5 vertebral levels (Tr. 89);

- Dr. Vitols, who recognized in March 2004 that Plaintiff had limited range of motion and decreased strength in his right shoulder along with restricted spinal motion associated with low back pain (Tr. 121);

- Dr. Powell, who described, in September 2004, attenuation of Plaintiff's medial collateral ligament and a basketball-sized hematoma along his left thigh (Tr. 158);

- Dr. George, who diagnosed Plaintiff in July 2006 with multilevel degenerative disc disease and noted that surgical intervention was possible (Tr. 334); and

- A licensed physical therapist, Ms. Callahan, who recognized Plaintiff's need for an electric scoot in August 2006 (Tr. 330).

Plaintiff's reliance on these opinions or records does not support his challenges to the ALJ's decision.

Dr. Jump treated Plaintiff in November 1994, about eight years prior to Plaintiff's alleged onset of disability and at a time while Plaintiff was working. (Tr. 89). Clearly, Dr. Jump's notations did not support a finding of disability. As described above, Dr. Vitols' evaluation also did not describe a disabled individual.

Similarly, although Dr. Powell concluded that Plaintiff could not work for various periods of time, she indicated that her opinion about Plaintiff's functional restrictions was for discrete periods of time. *See* Tr. 157, 167, 168, 169. In August 2004, after Plaintiff's motorcycle accident, she noted Plaintiff should not work for four weeks; this notation was later amended to six to eight weeks. (Tr. 157, 167, 168). In October 2004, Dr. Powell restricted Plaintiff for thirty days (Tr. 157). There is no indication that Dr. Powell thought Plaintiff was under a "disability" within the meaning of the Social Security Act; instead she appeared to believe that Plaintiff required an adequate recovery period from his August 2004 motorcycle accident, which did not meet the durational requirement of the Social Security Act. *See* 42 U.S.C. §423(d)(1)(A) (disability means the inability to engage in any substantial gainful activity by reason of any medically determinable

impairment which has lasted or can be expected to last for a continuous period of not less than twelve months).

Plaintiff asserts that a Dr. Gary George diagnosed him with multi-level degenerative disc disease and noted that a surgical intervention was possible. However, it appears that Dr. Prasad was the physician who made this notation. (Tr. 334). In any event, these notes did not establish that Plaintiff was disabled or had any specific functional restrictions. Indeed, Dr. Prasad noted Plaintiff's obesity and made repeated comments that Plaintiff continued to have bad eating habits and did not exercise and would try for weight reduction through exercise and diet control. (Tr. 334).

Finally, physical therapist Ms. Callahan's notation that Plaintiff would be fit for an electric scooter likewise did not necessitate a finding of disability. (Tr. 330). Ms. Callahan was not a physician and provided no objective findings that established a need for a scooter. (Tr. 330).

Dr. Fenberg's opinions were also inconsistent with other record evidence, particularly that regarding Plaintiff's activities. Significantly, although Plaintiff alleged he became disabled in September 2002, he worked and performed a full-time job from July through November 2005, at the level of substantial gainful activity. (Tr. 14, 360-61). In March 2004, Plaintiff reported to the state agency that, on an average day, he looked for employment usually through internet sources, for several hours. (Tr. 64). Plaintiff stated that he sent out resumes and followed-up. (Tr. 64). At that time, he was working with access database. (Tr. 64). Plaintiff was a board member of a local club and was involved with inputting information into a database. (Tr. 64). Plaintiff later reiterated that he spent considerable time on his computer and actively looked for work daily on the internet. (Tr. 116, 137). Plaintiff's goal for the future was to open his own business, but he could not find financial backing for such a venture. (Tr. 138).

On one occasion, when asked why he could not work, Plaintiff responded, "No one will hire me. I don't know why" (Tr. 137). However, in June 2006, Plaintiff reported

that he turned down a job offer in Indianapolis (Tr. 284). Notably, although he alleged disability beginning in September 2002, he was able to continue riding his motorcycle; and when Plaintiff was interviewed in the field office at the time of his application, in February 2004, he talked about riding his motorcycle when the weather became warmer. (Tr. 62-63). In April 2004 Plaintiff reported that he had a Harley-Davidson motorcycle, and he found riding his motorcycle therapeutic because he "gets pride" (Tr. 139). Although he was in a motorcycle accident in August 2004 (Tr. 158), in July 2006 he reported that he was still able to ride his motorcycle with difficulty getting on and off it. (Tr. 333). In addition, during the ALJ's hearing, Plaintiff testified that he rode his motorcycle a couple of times a month. (Tr. 381).

Plaintiff was likewise active in AA and went to as many as two or three meetings per day, sometimes led the meetings, and was in close contact with two sponsors. (Tr. 137). He also was in contact with his parents and sister. (Tr. 139). Plaintiff also went to church once a week. (Tr. 289, 380). Plaintiff went on a trip to Tennessee with his parents in June 2006. (Tr. 285, 286). He visited with his friend who owned an automotive shop once or twice a week. (Tr. 382-83). Plaintiff also played games on the computer. (Tr. 138). And he also reported doing some household cleaning in preparation to sell his house. (Tr. 139).

Plaintiff's search for work, and his recreational and daily activities, contradict Dr. Fenberg's opinion that he was able to stand and walk less than one hour in an eight-hour day.

Accordingly, for all the above reasons, the ALJ applied the correct legal criteria to Dr. Fenberg's opinions and substantial evidence supports the ALJ's reasons for discounting Dr. Fenberg's opinions.

**B.**     **Plaintiff's Remaining Contentions**

Plaintiff argues next that the Commissioner erred by rejecting his testimony about the severity of his impairments, because objective medical evidence supported his statements in describing the intensity and frequency in his pain.

Pain or other symptoms can be severe enough to constitute a disability, if caused by a medical impairment. *See Kirk v. Secretary of H.H.S.,* 667 F.2d 524, 538 (6th Cir. 1981)(pain alone may constitute a disability); *see also* 20 C.F.R. §404.1529. Although the Regulations concerning pain and other symptoms are lengthy, the Sixth Circuit Court of Appeals has enunciated the applicable standard in "a more succinct...." two-part analysis. *Felisky v. Bowen*, 35 F.3d 1027, 1038 (6th Cir. 1994). Part one considers "whether there is objective medical evidence of an underlying medical condition...." *Felisky*, 35 F.3d at 1038 (quoting *Duncan*, 801 F.2d at 853). If such objective medical evidence exists, then part two requires consideration of two alternative questions:

1.     Whether objective medical evidence confirms the severity of the alleged pain [or other symptom] arising from the condition; or

2.     Whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain [or other symptom].

*Felisky*, 35 F.3d at 1038-39 (quoting *Duncan*, 801 F.2d at 853). Neither *Felisky's* two-part test nor the Regulations upon which it is based require objective medical evidence of pain itself. *Felisky*, 35 F.3d at 1039.

An ALJ's findings concerning the credibility of a claimant's testimony about his or her pain or other symptoms "are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997).

The ALJ applied the correct legal criteria to his evaluation of Plaintiff's credibility. *See* Tr. 17-20. Contrary to Plaintiff's contentions, substantial evidence supports the ALJ's credibility determination. The ALJ reasonably found that certain factors

undermined Plaintiff's credibility. *See id.* The ALJ correctly recognized that Plaintiff testified that he has used a cane since the 1990's but it has never been prescribed by any physician. (Tr. 19). Yet during a consultative evaluation, Dr. Vitols noted that Plaintiff used no ambulatory aid (Tr. 121). The ALJ reported that Plaintiff sat in the hearing for 50 minutes, arose twice about 20 minutes apart each time for less than a minute. (Tr. 19). Plaintiff also rode his motorcycle on occasion. (Tr. 19, 62-63, 139, 158, 333, 381).

In addition, Plaintiff's self-reported activities are inconsistent with his pain testimony and claim of disability. For example, Plaintiff reported to Dr. McIntosh that he plays computer games, checks the internet for possible job opportunities and sends out resumes over the internet for one to two hours a day. (Tr. 138-39). Plaintiff also participates in AA meetings, associating with people several times a week, and sometimes leads and organizes these meetings. (Tr. 19, 139). As mentioned above, Plaintiff also rides his motorcycle, write poetry and attends church (Tr. 380-81). Further, Plaintiff has no side effects from any medications he takes. (Tr. 18A). Given this substantial evidence, the ALJ's credibility determination may not be overturned. *See Walters,* 127 F.3d at 531 ("ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.").

Accordingly, Plaintiff's challenges to the ALJ's credibility findings lack merit.

## IT IS THEREFORE RECOMMENDED THAT:

1.      The Commissioner's final non-disability decision be affirmed; and

2.      The case be terminated on the docket.


June 29, 2009

                                        _____s/Sharon L. Ovington_____
                                        Sharon L. Ovington
                                        United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by mail. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Am,* 474 U.S. 140 (1985).